546 A.2d 1162

**JOHN M., Appellant,**

v.

**PAULA T. and Michael T., Appellees.**

Superior Court of Pennsylvania.

Argued March 9, 1988.

Filed Aug. 18, 1988.

74

Steven B. Moss, Media, for appellant.
Scott D. Galloway, Media, for appellees.

Before ROWLEY, WIEAND and MONTEMURO, JJ.

WIEAND, Judge:

The principal issue in this appeal is whether a plaintiff who claims to be the biological father of a child born to a married woman can compel the mother's husband, who is a party to the action, to submit to Human Leukocyte Antigen (HLA) testing to assist the court in determining paternity. In the instant case, the trial court refused to order such testing and determined, after hearing, that plaintiff had failed to overcome the presumption of legitimacy which attached to the child's birth during coverture. From the dismissal of his complaint seeking to enforce visitation, the plaintiff appealed.

John M. and Paula T. met at work and began to see each other socially in September, 1977. By early 1978, they had become sexually intimate. Paula was then engaged to marry Michael T. Nevertheless, the relationship between John and Paula continued. John testified that they had discussed Paula's calling off the marriage but that Paula had declined, saying her parents "... would kill her if she called it off." In any event, the relationship came to an end in August, 1978, and Paula, in September, 1978, was married to Michael T. In March, 1979, however, Paula and John resumed their sexual liaison. On June 6, 1980, Paula gave birth to her first child. John has not claimed to be the father of this child.

After her first child had been born, Paula again renewed her affair with John. During January and February, 1981, they met several times in motels, where they engaged in sexual intercourse without birth control protection. In March, 1981, Paula discovered that she was pregnant, and on November 3, 1981 a second child, H.T., was born. During this pregnancy, according to John's testimony, Paula said that she thought John was the father of the child, and they discussed Paula's getting a divorce from her husband. John also said that on the day when Paula went to the hospital, she called him before and after H.T.'s birth to

arrange a time for John to visit. John produced photographs of the baby which, he said, he had taken during his hospital visit. After H.T.'s birth the relationship between John and Paula was again renewed and continued until September, 1983, when it was terminated. Between November, 1981, and September, 1983, according to John, he continued to visit H.T. He also produced cards which had been sent to him by Paula, including a Father's Day card which contained H.T.'s name. He also offered photographs of mother and child which, according to his testimony, he had taken on the various occasions on which he had visited Paula and H.T. The only reason he had not contributed to the child's support, he said, had been Paula's fear of being unable to explain the source of the money to her husband. Meanwhile, John opened a trust account for H.T.

In 1984, after their intimate relationship had come to an end, Paula refused to allow John to see the child. She admitted, when called as of cross-examination, that she had had intercourse with John in early 1981, but said that she could not recall any discussion with him about the possibility of his being the father and denied any discussion about her getting a divorce. She said that the last occasion on which they had had intercourse had been in December, 1981. She also denied that John had visited her at the hospital after H.T.'s birth but conceded that she had sent a Father's Day card. She explained that John had been a friend whom she wished to cheer up. She denied any knowledge that John was claiming to be H.T.'s father.

In December, 1984, Paula, her child, and John submitted to HLA testing. The results, as interpreted by an expert whose deposition and report were admitted at the hearing, showed a 97.471% probability that John was the natural father as compared to a random male. The test also showed that he was 38 times more likely to provide the required genes for the child than a random male. The expert concluded that this percentage was "in the mid range of results" compared to test results in other cases "in which the alleged father was not excluded."

Michael T. did not participate in a blood test to determine paternity. He testified that he and his wife had never been separated and had engaged regularly in sexual intercourse. During December, 1980 and January and February, 1981, they had engaged in marital relations three or four times a week. He testified that he had been at the hospital when H.T. had been born and had assisted in her delivery. He said he was certain that he was H.T.'s father.

The trial court determined that John had failed to overcome the presumption of legitimacy and denied relief. Post-trial motions were denied, and this appeal followed.[1]

 The presumption of legitimacy is one of the strongest presumptions in the law. *Manfredi Estate,* 399 Pa. 285, 289, 159 A.2d 697, 699 (1960). See also: *Connell v. Connell,* 329 Pa.Super. 1, 6, 477 A.2d 872, 875 (1984). Until recently, the presumption could be overcome only by evidence of overwhelming weight "establishing non-access or that the husband was impotent or had no sexual intercourse with his wife at any time when it was possible in the course of nature for the child to have been begotten." *Commonwealth ex rel. Ermel v. Ermel,* 259 Pa.Super. 219, 221, 393 A.2d 796, 797 (1978), quoting *Cairgle v. American Radiator & Standard Sanitary Corp.,* 366 Pa. 249, 255, 77 A.2d 439, 442 (1951) (citations omitted). The presumption is not overcome by showing that the wife was living in adultery unless non-access of her husband can also be shown. *Cairgle v. American Radiator & Standard Sanitary Corp., supra,* 366 Pa. at 256, 77 A.2d at 442. Since the adoption in Pennsylvania of the Uniform Act on Blood Tests to Determine Paternity, 42 Pa.C.S. §§ 6131 et seq., the presumption of legitimacy has been relaxed to some extent. Thus, the provisions of 42 Pa.C.S. § 6137 permit the presumption of

---

1. The trial court's original order also denied John M.'s request for visitation on grounds that it would not be in the child's best interests to allow such visits. This was removed and eliminated from the trial court's amended order. It is nevertheless clear from the amended order that appellant has been put out of court without relief. Therefore, the court's order is final and appealable. *Gordon v. Gordon,* 293 Pa.Super. 491, 439 A.2d 683 (1981), *affirmed,* 498 Pa. 570, 449 A.2d 1378 (1982).

legitimacy to be overcome by blood tests which exclude the mother's husband as the possible father.[2] See: *Nixon v. Nixon*, 354 Pa.Super. 232, 511 A.2d 847 (1986). Nevertheless, to defeat the presumption of legitimacy there must be evidence which is clear and convincing. *Burston v. Dodson*, 257 Pa.Super. 1, 11, 390 A.2d 216, 221 (1978). Cf. *Williams v. Milliken*, 351 Pa.Super. 567, 506 A.2d 918 (1986).

■ In the instant case, there was not one iota of evidence to show that Michael T. could not be H.T.'s father. The trial court accepted and found credible his testimony that, during the period in which conception had occurred, he and Paula had been living together as husband and wife and had engaged in sexual intercourse several times a week. Moreover, there was no evidence that Michael had been sterile or impotent. Finally, there were no blood tests which excluded the husband as father of H.T.

■ John contends that the results of the blood tests to which he, the mother, and the child submitted tend to show that he is the father of the child and not the mother's husband. However, these blood tests are only a part of the evidence. They do not exclude Michael but merely show a degree of probability that John is the father.

> 42 Pa.C.S.A. § 6136 (Uniform Act on Blood Tests to Determine Paternity) provides that if all experts agree that blood tests *exclude* a defendant as a possible father, the question of paternity is to be resolved accordingly. Absent a legislatively enacted provision making positive blood tests also conclusive, we must view them as only part of the evidence.

*Turek v. Hardy*, 312 Pa.Super. 158, 163 n. 6, 458 A.2d 562, 565 n. 6 (1983) (emphasis added). Therefore, the results of appellant's blood tests are to be deemed only one factor

---

**2.** This section provides as follows:
> The presumption of legitimacy of a child born during wedlock is overcome if the court finds that the conclusions of all the experts as disclosed by the evidence based upon the tests show that the husband is not the father of the child.

which may be considered by the court in making its determination. *Nixon v. Nixon, supra,* 354 Pa.Super. at 238 n. 5, 511 A.2d at 850 n. 5.

■ The other factors relied upon by appellant to overcome the presumption of legitimacy included the longstanding relationship between him and Paula, acts of sexual intercourse within the time-frame of H.T.'s conception, and his testimony that the mother had indicated her belief that he was the child's father. We agree with the hearing court that this evidence, even in conjunction with the HLA test results, was insufficient to overcome the presumption that Michael T. was H.T.'s father.

Acting pursuant to Pa.R.C.P. 4010(a), appellant requested the trial court to order Michael to submit to HLA testing.[3] This petition was denied. Appellant argues that this was error.

Pa.R.C.P. 4010(a) provides as follows:

When the mental or physical condition (including blood group) of a party, or of a person in the custody or under the legal control of a party, is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a physician or to produce for examination the person in his custody or legal control. The order may be made only on motion for good

---

**3.** Blood tests are also authorized by 42 Pa.C.S. § 6133 as follows:
 **Authority for test**
 In any matter subject to this subchapter in which paternity, parentage or identity of a child is a relevant fact, the court upon its own initiative or upon suggestion made by or on behalf of any person whose blood is involved may, or upon motion of any party to the action made at a time so as not to delay the proceedings unduly, shall order the mother, child and alleged father to submit to blood tests. If any party refuses to submit to such tests, the court may resolve the question of paternity, parentage or identity of a child against such party, or enforce its order if the rights of others and the interests of justice so require.
 In *Burston v. Dodson, supra,* 257 Pa.Superior Ct. at 10 n. 10, 390 A.2d at 220 n. 10, it was questioned whether the authority given to a court to order an "alleged father" to submit to blood tests included authority to compel a "presumed father" to submit to testing. It may be that this issue prompted appellant to base his request for testing on Pa.R.C.P. 4010(a).

cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions and scope of the examination and the person or persons by whom it is to be made.

This rule, however, does "not apply to ... an action for custody of minor children except to the extent prescribed by the rules governing [that] action[ ]." Pa.R.C.P. 4001(a)(2).

Pa.R.C.P. 1915.5(c), which governs actions for custody and visitation, provides that "[t]here shall be no discovery unless authorized by special order of court." The purpose for this limitation appears in the Explanatory Note to Rule 4001 as follows:

> The amendment excludes any automatic right to discovery in support proceedings.... To avoid the possibility of a defendant spouse using discovery as a tool for harassment, abuse and delay, the amendment requires leave of court in all support proceedings. *This should be freely given where it is essential to a just disposition of the matter.*
>
> Proceedings for custody of minor children are subject to the same provision for leave of court. (emphasis added).

■ It is apparent from these rules that blood grouping tests are available in custody and visitation proceedings only by leave of the court in which the action is pending. Where "good cause" is shown, however, leave of court should be freely given to insure a just disposition of the matter. The requirement of "good cause" is not merely a formality. Rather, it is a limitation upon the right to compel a litigant to submit to the test. As such, it entails more than mere relevancy. Whether "good cause" exists will vary according to the circumstances of each case. The ability of the petitioning party to obtain the information by other means is a significant consideration. To show good cause, the condition as to which examination is sought must genuinely be in controversy, and it must appear that the examination will substantially aid in resolving the dispute. Nevertheless, much must be left to the discretion of the

court to which the petition is presented. See: *Schlagen-hauf v. Holder*, 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964) (interpreting good cause requirement of Federal Rule of Civil Procedure No. 35).

In the instant case, the trial court denied appellant's request because the presumption of legitimacy had not been overcome by appellant's evidence and, therefore, court ordered testing would constitute an invasion of the husband's privacy. This reasoning, we believe, was faulty.

This Court has held that a putative father has standing to litigate a claim that he is the biological father of a child born to a woman while she was married to another, who is presumed to be the child's father. See: *Williams v. Milliken, supra.* Having recognized the right of the putative father to litigate his claim, however, we cannot then take away from him the same right to prove his claim as other litigants enjoy. Guarantees of due process and equal protection command that the courts shall not create artificial barriers which will make it impossible for a contending biological father to litigate his private interest in a child whom he allegedly has sired. Cf. *R. McG. v. J.W.*, 200 Colo. 345, 615 P.2d 666 (1980) (statute which deprived putative father of access to courts to assert claim of paternity violates principles of equal protection); *Anonymous v. Anonymous*, 472 So.2d 640 (Ala.Civ.App.1984) (putative father of child born to married woman is entitled to opportunity to present evidence to rebut presumption that mother's husband was father). Thus, it seems clear that Pa.R. C.P. 4010(a) must be applied evenhandedly and, indeed, ungrudgingly, in the case of a putative father who is required to rebut a presumption of legitimacy in order to establish his claim of paternity in the case of a child born to a married woman. Although the Commonwealth unquestionably has an interest in strengthening family life and in affording legitimacy to children, these interests can adequately be protected by the presumption of legitimacy.

To the extent that the allowance of blood testing is a policy issue, moreover, that policy has been established in

favor of the putative father's claim of paternity by the legislature. This follows by necessary implication from the enactment of 42 Pa.C.S. § 6137, which permits the presumption of legitimacy to be overcome by the use of blood grouping tests.

In the instant case, appellant can only rebut the strong presumption of legitimacy by clear and convincing evidence that Michael cannot be the biological father of H.T. Absent proof of non-access or impotency on the part of the mother's husband during the time-frame of conception, the only evidence which can rebut the presumption of legitimacy is scientific testing which excludes Michael's paternity. The HLA test has been recognized as a reliable technique. *Turek v. Hardy, supra* 312 Pa.Super. at 161, 458 A.2d at 564. Rule 4010, although it requires a showing of good cause, does not require that the movant prove his case prior to the ordering of blood tests. See: *Schlagenhauf v. Holder, supra.* Had petitioner been able to overcome the strong presumption of legitimacy with evidence otherwise available to him, he would have had no need for medical evidence.

In the instant case, appellant cannot hope to prove his claim without scientific testing. No other evidence sufficient to overcome the presumption of legitimacy is available to him. Of course, the HLA tests which he has requested may also be inadequate to demonstrate that Michael is not the natural father and overcome the presumption of legitimacy. Nevertheless, it is patently clear that the test is crucial to appellant's claim. Without it he cannot hope to prove his claim and is out of court. We conclude, therefore, that he established "good cause" for an order directing Michael to submit to HLA testing. When appellant's need for the information which can only be supplied by testing is balanced against a party defendant's right of privacy, the scales weigh heavily in favor of court ordered testing. When the trial court, nevertheless, refused to order the tests, it abused its discretion.

The trial court, understandably, was concerned about the effect of its ultimate decision on the welfare of the child. That concern, however, cannot be permitted to bar appellant's right to attempt to prove his claim of paternity. It may be that the requested testing will not exclude the possibility of Michael's parentage. In that event, appellant's claim will undoubtedly fail. On the other hand, even if appellant is able to overcome the presumption of legitimacy, the trial court has not received evidence or heard argument as to whether appellant's asserted right to visit the child will be in the child's best interest. We hold only that appellant cannot be precluded from litigating his claim of paternity consistently with procedural rules applicable to other litigants for whom the courts are open.

Reversed and remanded for further proceedings consistent with this opinion. Jurisdiction is not retained.