## P.D. v. W.J.D.

C.P. of Luzerne County, no. DR454 of 1994.

*Gregory S. Skibitsky Jr.,* for plaintiff.
*Elliot B. Edley,* for defendant.

MUROSKI, *J.,* June 13, 2002—This matter comes before the court on a petition, filed by the defendant, W.J.D., to dismiss a child support obligation based upon an agreement of support dated August 24, 1994, and made an order of court on August 31 of that year. The defendant's petition to dismiss was filed October 26, 2001, nearly 11 and 1/2 years after the birth of the child for whom he pays support.

During the course of the parties' marriage, and while the parties were cohabiting as husband and wife, a child was conceived. W.D. Jr. was born on March 19, 1990. Nearly four years later, P.D. now known as P.S. filed a complaint in divorce, after which the parties separated. A divorce decree was entered on May 12, 1995, just before the child's fifth birthday. After separating, the parties entered into a support agreement on August 24, 1994, whereupon the husband became obligated to pay child support. Unbeknownst to the husband, and for over a decade thereafter, at the time the child was conceived, his wife had been having sexual relations with another man. Having no reason to suspect that the child was not

his, the husband raised the child as his own, supporting him as any decent, responsible parent would.

In 1996, however, according to the testimony of the mother, the true biological father of the child, her former paramour, stopped at her ex-husband's house for reasons never explained. When Mr. D. asked his ex-wife if B. was his child, the mother told him, "Yes." (H.R. 33-34.) Satisfied with the answer, Mr. D. continued to support and treat B. as his own child until late in the 2000 or early in 2001 when it became apparent to him that the child's appearance, mannerisms and other indicators gave him reason to believe that the child was nothing like him at all; prompting a second inquiry to his ex-wife of the child's paternity. (H.R. 49, 55.) Convincing his ex-wife to undergo DNA testing because of these suspicions, the results, issued March 14, 2001, proved conclusively that Mr. D. was not the child's father. The probability of paternity was zero percent!

Not wanting to direct his anger or point any blame at the child who was, himself, going through a hailstorm of emotion and heartache at the time, Mr. D. tried to convince his ex-wife that, together, they should sit down and talk with B. The mother, however, decided for the first time to tell her son the truth by herself. Shortly thereafter, Mr. D. as gently as possible removed himself from the child's life in a way which he felt would cause the child the least amount of anguish and hurt.

In filing his petition to dismiss the support obligation, Mr. D. argues that under the devastating circumstances of this wife's infidelity, deception and intentional decision to keep the true facts surrounding the circumstances of the child's conception to herself, he was made a cuck-

old by her and misled to believe that he was the biological father of the child—a fact which now has been scientifically disproved beyond doubt. To prevent any further injustice to him, he requests that the current child support order be dismissed and that he be entitled to recover all of the child support paid to his ex-wife. For the reasons set forth below, this court is inclined to grant in part and deny in part the petitioner's request.

Over the years, our appellate courts have been faced with various cases involving DNA paternity tests vis-à-vis a child conceived by and born to a married woman. Historically, the law presumed that a child born to a married woman is the child of the woman's husband and this presumption has been one of the strongest presumptions known to the law. *Strauser v. Stahr,* 556 Pa. 83, 726 A.2d 1052 (1999).

This presumption, however, can be rebutted only by proof either that the husband was physically incapable of fathering a child or that he did not have access to his wife during the relevant period of conception.

In the present case, the presumption of paternity initially applies because the child was conceived and born to Mrs. D. while she was married to her husband, W. The presumption is not rebutted because there was no evidence of non-access, sterility or impotency. But since the policy underlying this presumption of paternity is the preservation of the marriage, it "only applies in cases where that policy would be advanced by the application; otherwise it does not apply." *Fish v. Behers,* 559 Pa. 523, 528, 741 A.2d 721, 723 (1999) quoting *Brinkley v. King,* 549 Pa. 241, 250-51, 701 A.2d 176, 181 (1997). This court finds, however, that since the parties have long been

divorced, there is no marriage to preserve and so, the presumption of paternity is inapplicable.

Consequently, appellate courts require a further analysis into the question of estoppel to determine if the presumptive father continued to hold the child out as his own after becoming aware of the true circumstances of the child's conception. Furthermore, the issue of estoppel also requires an analysis of any misrepresentation, falsehoods, deception or fraud perpetrated by the biological mother upon which her husband relied to his detriment.

At the time of the child's birth and the parties' divorce, Mr. D. had no reason to suspect that he was not young B.'s father. His wife listed him as the father on the birth certificate and as the child's father in the divorce complaint. The child bears the husband's last name, and, in all likelihood was listed as a dependent on the couple's income tax returns. *Fish v. Behers, supra,* 741 A.2d at 723-24. She sought child support from her estranged husband averring under oath that he was the child's father. In 1996, when questioned by her ex-husband, she again declared to him that he was the child's father. (H.R. 33-34.) Given these statements of assurance, it is understandable that Mr. D. raised the child believing him to be of his own flesh and blood. It was not until just before the parties submitted to DNA testing that the child's appearance, mannerisms and behavior were such as to plant reasonable doubt in the mind of Mr. D. Shortly thereafter, the results of the DNA tests conclusively proved that he was not the child's father. It was only this time that his ex-wife told him of the affair she had with another man at or about the time of the child's conception. Upon

learning of this painful truth, Mr. D. quickly but gently faded from the young boy's life in a manner designed to cause the child the least emotional harm. Therefore, from "the time he was reasonably aware of his non-paternity," he justifiably denied paternity and refused to accept responsibility for the child. *Christianson v. Ely,* 390 Pa. Super. 398, 410, 568 A.2d 961, 966 (1990).

It is abundantly clear to this court that Mr. D. had been operating for more than a decade under the misrepresentation that he was, indeed, the child's father. This subterfuge was a direct result of the mother's intentional misstatements and deceptions to him. She deluded herself by refusing to even consider that her child might be fathered by the man with whom she had an illicit affair. She never once mentioned her meretricious relationship with this third party to her husband. Instead, she fallaciously led him to believe, at the same time she was seeking child support from him, that he was, in fact, the child's father. Had she been forthright to her spouse and explained what she had done at the time of the child's conception, her husband may certainly have acted differently. Unfortunately, her deceit, falsehoods and misrepresentations gave Mr. D. no reason but to treat the child as his own—with love, care and respect, as only a decent human being would do under the circumstances.

Should we now continue to financially punish him for his righteousness? This court thinks not.

The law has always stood for that which is right, truthful and just. At this time in man's history we have split the atom, walked on the moon, searched the heavens and stars of far away galaxies, medically cloned animals and have started to discover the code of genetic secrets. If

man can do the above, why does the law have to twist and turn and contort concepts of fatherhood by clinging to fictions and legal delusions which sometimes seem to make little or no sense at all? Medical science has advanced to the point where a man can be completely excluded from being the father of a particular child. That is exactly what has happened in this case. Only one man can be the biological father of a child "and when his paternity is determined, he is the *only* man legally obligated to support the child." *Martin v. Martin,* 710 A.2d 61, 65 (Pa. Super. 1998). (emphasis added) In the case before this court, Mr. D. should not be financially penalized for having done what is just and righteous toward the young boy. Neither should the mother continue to be rewarded for her deception. The statute of limitations provides the biological mother ample time to seek child support from the person she believes and in this case seems to know, fathered her child. The true father should be the only man obligated to support his son. Mr. D. should not be obligated by the legal fiction of paternity by estoppel to continue to support a child which has been proven conclusively not to be his own offspring, particularly in this case fraught with the mother's lies, deceit, fraud and misrepresentations.

The courts should not "apply equitable principles to perpetrate a pretense" neither should it "punish the party that sought to do what was righteous and reward that party that has perpetrated a fraud." *Kohler v. Bleem,* 439 Pa. Super. 385, 397, 654 A.2d 569, 575-76 (1995). To continue to hold Mr. D. liable for the child's financial support because of the mother's dishonesty to her marriage vows and to her spouse violates concepts of com-

mon sense, decency, and fundamental fairness. It is also a violation of public policy for it would encourage a clever woman to continue sexual relations with both her husband and her paramour around the time of any conception with no fear that anyone, but her husband, would be held liable for the child's support.

Knowing exactly who is the child's true biological father, however painful at this point, can only benefit the child and his progeny. Tomorrow, or possibly a generation or two from now, a gene splicing transference medical procedural or other futuristic operation may save B.'s life or that of his child or grandchild only because the true identity of his biological father was definitively known.

It is time that our legislators update the paternity laws so they catch up with the advances of modern medical science. This is not a new concept, for Thomas Jefferson, nearly two hundred years ago, said:

"I am not an advocate for frequent changes in laws and constitutions, but laws and institutions must go hand in hand with the progress of the human mind. As that becomes more developed, more enlightened, as new discoveries are made, new truths discovered and manners and opinions change, with the change of circumstances, institutions must advance also to keep pace with the times." Letter from Thomas Jefferson to Samuel Kercheval, Monticello, July 12, 1816; from *Classical Philosophical Questions*, James A. Gould (p. 480, 9th ed. 1992).

Therefore, it is the decision of this court that the defendant's petition to dismiss the child support order

currently in effect is granted effective with the filing of the petition. As the previously paid child support up to that time ostensibly has been used for the support of young B., the mother will not be ordered to repay those funds to her ex-husband in this case.

## ORDER

Now, June 13, 2002, upon consideration of defendant's petition to dismiss, the arguments, evidence, testimony, briefs of counsel and the entire record, it is hereby ordered and decreed that the petition is hereby granted in part and denied in part, with the defendant's petition to dismiss the support order currently in effect being granted effective with the filing of the petition and defendant's request for an award in the amount of the previously paid child support being denied.

Compliance herewith is directed.